Argued February 20, affirmed May 1, 1929.

TITLE & TRUST CO. *v.* SECURITY BUILDINGS CORPORATION.

(277 Pac. 85.)

For appellant there was a brief and oral argument by *Mr. W. C. Bristol.*

For respondent there was a brief and oral arguments by *Mr. A. B. Winfree* and *Mr. E. C. Bronaugh.*

Suit to foreclose mortgage. Defendant appeals from decree for the plaintiff.

ROSSMAN, J.—This is a suit to foreclose a mortgage which was executed by appellant as the basis of an issue of $350,000 bonds secured by a property in the City of Portland known as the Security Building; the mortgage, which was in the form of a trust deed,

dated July 19, 1924, named the plaintiff as trustee, and made provision that the defendant-appellant, Security Buildings Corporation, should execute a lease for the term of ten years to the Security Storage & Transfer Company, another corporation; it provided that the monthly installments of rent should be paid to the plaintiff and should be employed by it for the discharge of the semi-annual interest coupons, and the retirement of bonds: $7,000 of the latter were made payable June 15, 1926, and thereafter increasing amounts became due every six months thereafter. The trust deed stipulated that the defendants, Security Storage & Transfer Co. and E. F. Younger, president of both corporations, should be bound as guarantors. That instrument further provided that the contemplated lease should require advance payment of the last installments of rent to the extent of $15,000. The complaint alleged the foregoing facts, together with the execution of the lease. It quoted those portions of the trust deed pertaining to defaults, and the powers of the trustee. Attached to it, and made a part of it by reference, is the trust deed. The default of the defendant is averred in the following particulars: (1) failure to pay the principal and interest due June 15, 1926, and (2) failure to pay the advance rental of $15,000 above mentioned. The complaint averred the giving of a proper default notice and prayed for a foreclosure of the entire mortgage debt. It was filed June 17, 1926. The complaint was met by a motion to dismiss on the ground (1) that the suit was prematurely brought; (2) that the plaintiff was possessed of no cause of suit, and (3) that a wrongful acceleration of the debt was alleged in the complaint. The motion being overruled the two corporate defendants filed eighteen pleas in abate-

ment, to which the plaintiff demurred. When the latter was sustained the defendants demurred to the complaint. This was overruled, whereupon an answer was filed consisting of 76 pages. After its admissions and denials there are four affirmative defenses. The first of these alleges that June 15, 1926, the trustee had in its possession $25,000 of second preferred stock of the Security Storage & Transfer Company which it should have reduced to cash, and that if it had done so the proceeds, together with sums of money and other assets in its possession, would have enabled it to pay the interest coupons and retire the bonds falling due on that day. This defense alleges that the plaintiff was partisan, interested, and partial, and particularly alleges that through its failure to offer the stock for sale, its failure to collect rents, and its disregard of duties, it attempted to create a cause of suit. The second affirmative defense alleges that by virtue of the trust deed the plaintiff was possessed of a majority of its outstanding stock, 1,751 shares; that the purpose of this arrangement was to enable the plaintiff to control the appellant during the periods of time covered by the bond issue. The answer alleges that the plaintiff subverted such purpose, and failed and refused to act for the benefit of the defendant. It continues that while the trustee had sufficient funds in the sinking fund and securities in lieu of money, it refused to apply them for the purpose for which they were given, and became possessed of a purpose to vex and harass the defendants and, wilfully failed to comply with the terms of the mortgage. The third affirmative defense alleges that the plaintiff, together with the firms of bond underwriters, which had sold the bond issue, knew that the debt could be discharged

only from rent earned by the building; that after the trust agreement, as originally contemplated was drafted, the plaintiff and the underwriters caused changes to be made in its terms and provisions, and that their purpose was to unconscionably circumscribe and limit the right of contract and the right to have the courts determine whether a default had actually occurred. This defense alleges several of the clauses of the trust deed and charges that they are invalid. It also alleges that the trustee acted adversely to the best interests of the appellant and that it was actuated by a hostile motive.

■ ■ The fourth affirmative defense charges a conspiracy upon the part of the plaintiff, a bank, the underwriters, and many others, to ruin the defendants and secure their property; it alleges that the bond issue and trust deed were resorted to as instrumentalities which would eventually deprive the defendants of their properties. This defense states a large sum of money as damages which it avers the defendants incurred as the result of this conspiracy. The reply put in issue most of the allegations of these affirmative defenses. Thereupon the defendants moved against the reply. After this motion had been denial, a trial, which consumed three weeks of time occurred; it resulted in a decree in favor of the plaintiff. Only the defendant, Security Buildings Corporation, appealed. It assigns twenty-eight errors.

The testimony covers almost 1,100 pages; in addition, the record includes approximately 200 documents, consisting of letters, book entries, ledgers, corporate minute-books and various other documents. We have carefully read and studied this entire record. The evidence delineates in minute detail the inception of

this transaction and its complete history down to and including the institution of this suit. Apparently no detail was permitted to hide itself from full exposé upon the witness-stand. Thus mentioning only a few of the many early events revealed by the evidence, we find that many years ago one E. F. Younger, withdrew, in part, from the real estate business in which he had been previously engaged, and entered the warehouse business, that he subsequently became interested as tenant in the Security Building, and still later acquired an option whereby he was privileged to purchase it at a price of $300,000. The testimony indicates that he later caused to be incorporated the Security Transfer & Storage Company, became its president, and that Mr. F. E. Grigsby was elected vice-president. In the early part of 1924 the Transfer Company became desirous of purchasing the building. It had previously made substantial changes to it in an endeavor to convert it from a warehouse structure into an office building, and apparently felt that if the construction work could be completed the income would be sufficient to eventually pay the purchase price if that could be deferred. At this time it opened negotiations for a loan of a desirable size. First life insurance companies were consulted, and next underwriters of bond issues. So diligent were the inquiries that Clark, Kendall & Company, Inc., whose services were finally secured, threatened to abandon the project if the defendants continued "to shop around." An arrangement was effected whereby the latter concern agreed to buy an issue of $350,000 bonds to be sold upon a basis of netting the appellant $94 for each $100 unit. The bonds were to be redeemed serially. It is desirable to state at this point that the appellant

was created by the Transfer Company because of a belief that bonds issued by a building company would sell better than an issue sponsored by a transfer and storage company. To effect their purpose it was contemplated that the appellant should acquire title to the building and that the Transfer Company should become tenant under a lease stipulating for enough rent to cover interest charges and serial payments upon principal commencing two years after the issue. This arrangement the parties felt would render the bonds attractive to the public, and would enable the Transfer Company to acquire the ownership of the property through its subsidiary. As we have seen the purchase price of the property was $300,000, while the bond issue was $350,000. As a matter of fact the Marshall-Wells Company, vendor of the property, was paid only $250,000 in cash; it was induced to accept for the balance of $50,000, preferred stock of the transfer company in that amount. Out of the proceeds of the bond issue, the building corporation paid the Transfer Company $50,000 for the aforementioned preferred stock, and $29,000 for the transfer of the lease. Thus the transfer company benefited to the extent of $79,000 cash by the bond issue. It felt that the property was worth $700,000; therefore from this amount it deducted $350,000, the amount of the debt, and issued to itself shares of stock to the amount of $350,000, par value, and thereby became the sole owner of the outstanding stock of the building corporation. Under the terms of the bond issue, 1,751 shares of this stock were transferred to the trustee so as to enable it to exert control over that corporation; there was also handed to it the resignations of the officers of that corporation.

We believe that the foregoing review of the evidence is sufficient to render understandable the disposition which we are about to make of this suit. The contentions of the appellant are so numerous, and attack the plaintiff's rights in such a basic manner, that they demand a consideration of the entire record. This we have given to it, but to undertake to set forth herein our review and consideration of the evidence for the purpose of indicating the reasons for our conclusions would prolong this decision to an unpardonable length. We shall, therefore, confine ourselves to a statement of our findings.

The fourth affirmative defense to the effect that the plaintiff joined the Ladd & Tilton Bank, the underwriters, and numerous other persons in a general conspiracy to ruin the two corporations and acquire this property wrongfully, was somewhat forsaken upon the trial; but, the appellant still contends that the trustee was partisan, that it was actuated by a wrong motive, that through officious conduct and the exaction of hard and unnecessary burdens, and through the withholding from the appellant of a substantial portion of the proceeds of the bond issue, it rendered it impossible for the appellant to meet the requirements of the trust deed. It contends that both the plaintiff and also the Ralph Schneeloch Co., underwriters, who joined the Clark, Kendall Company in the sale of the bonds, desired to obtain this property, and that the plaintiff's attitude was adopted for the purpose of bringing about a default and a foreclosure so that the property could be acquired at a sacrifice price. We understand that the appellant's charges concerning officious conduct and the exaction of hard burdens are based largely upon the

trustee's insistence that the Transfer Company should promptly pay its rent and that the requirement for the payment of the last $15,000 of rent should be met. This the defendants at that time felt burdensome because they preferred to use these moneys for construction work in preparing more offices. In the same breath that brings these charges to the ears of the Court, the appellant insists, with equal vehemence, that the trustee was derelict in not enforcing the payment of rent by the Transfer Company, and in its failure to bring about a resignation of the officers of appellant and an election of a personnel of its own choice. It is well to remind ourselves that all of the capital stock of the appellant was owned by the Transfer Company, and that the complaints previously mentioned are, therefore, nothing more than the latter's charges against itself. Turning to the evidence, however, we find no support for any of these charges. None of the proceeds of the bond issue were wrongfully withheld from the appellant. Upon the other hand they were promptly remitted, or applied to the uses designated by the appellant. Accurate statements of account were from time to time supplied, and appellant's books indicate that it received the full proceeds of the bond issue less items which constituted proper charges. The charges of a conspiracy we find are devoid of any foundation. Such averments cannot be sustained by a mere preponderance of the evidence because they encounter the presumption of innocence, yet the defendant's charges are supported by only an occasional inference drawn from a fact, or two, which would seem to support the inference only by a forced construction. The charges that the plaintiff was officious and unreasonable in its attitude towards the

appellant seem to be founded upon the following: (1) the plaintiff insisted upon the payment of the rent, (2) it demanded that $15,000, which the trust deed stipulated should be deposited with the plaintiff as payment of the last month's rent should be paid, (3) it refused to acquiesce in the appellant's plan to use rent money for carrying on its improvements, and (4) it felt it was improper for the appellant to move from this building to a new property which it had recently acquired under a lease. The plaintiff's attitude upon the latter of these four propositions finds some support in the lease, at least by implication; its business judgment was later vindicated when the appellant was evicted from its new building in an action of forcible entry and detainer. It is our opinion that none of the foregoing supports the appellant's contention. In each instance the plaintiff was discharging its fiduciary duty; had it done any less its performance would not have matched the exactions of the trust deed. To us it seems that these irritations did not arise out of any ill will displayed by the trustee, nor through any wrongful purpose possessed by it, but were due solely to the fact that Mr. Younger's two companies were unable to earn enough to defray the expenses of operation. In desperate efforts to finance their projects all concerned with the appellant's business borrowed money and gave the latter and the Transfer Company the benefit of the sums thus procured; having made these many personal sacrifices they, perhaps, felt that the plaintiff should permit the appellant to use rent money so as to facilitate the conversion of the warehouse into an office building and thereby hasten the coming of the day when income and outgo would equal one another. But the trust

deed did not authorize the plaintiff to grant such a permission.

The appellant insistently contends that the plaintiff waived the provision of the trust deed which required the payment of $15,000 on or before January 1, 1925, as payment of the final installment of rent. A careful reading of the evidence does not disclose that the respondent ever took such action; upon the other hand we are satisfied, both from the oral testimony and also from the written exhibits, that it continuously demanded that the defendants should meet that requirement of the lease.

We come now to the charges that the plaintiff was derelict in not prosecuting the collection of rent more diligently and in failing to force a resignation of the directors of the appellant on account of their indulgent attitude towards the Transfer Company. What we have already said will suffice in part to dispose of the contentions in regard to the collection of rent; it is only necessary to add that Mr. Younger testified that from the inception of the trust he heard nothing from the plaintiff but ''rent, rent, rent.'' The plaintiff's efforts to bring about a resignation of the old officers and an election of a new board was defeated through the illegal action of the appellant in holding a stockholders' meeting, without notice to the plaintiff, whereat a new board was elected. In an effort to gain recognition of the rights vested in itself by the possession of this stock and the resignation instrument the plaintiff called to the attention of the corporation commissioner this situation. As a result some new financing which the appellant contemplated was defeated, and this, in turn, it uses as the basis of a further contention of officious inter-

meddling. We deem all of these charges devoid of merit.

■ Much time was consumed in the court below in an investigation of the charge that the underwriters unduly delayed the sale of the bonds and the payment to the appellant of the proceeds. Even if this were true we fail to understand how this tardiness could be charged to the respondent. The facts apparently are that on April 30, 1924, Clark-Kendall & Co., Inc., made an offer for the bonds subsequently issued, which the Storage & Transfer Company accepted on condition that it was able to secure title from its landlord; it is agreed that no specific time was fixed for the acceptance of the bonds and payment of their price. About a month later a tentative draft of the trust deed was prepared. Several copies of it were handed to those interested. Numerous conferences were held before the parties could determine the ultimate conditions of the financing and the final form of the mortgage, bonds and lease. Finally these matters were agreed upon, but shortly thereafter the parties concluded that some modifications should be made to the instrument, and on July 9th agreed upon the suggested amendments. The instrument was redrafted, and was signed July 19th. August 7th the bonds were delivered to the respondent and August 8th the sum of $250,000 was paid by the underwriters to the trustee, and by the latter disbursed so that the appellant could pay that sum to its vendor. Thus the day following the receipt of the bonds the plaintiff paid to the appellant $250,000; the latter already had received $35,000 from the underwriter as an advance, and had directed the plaintiff to disburse from the proceeds of the bond issue various sums for which it was indebted to

others. Thus by August 8th it had received substantially all sums receivable by it from the issue. We fail to find anything in these circumstances which constitute any grounds for its charges.

■ The appellant contended that before the plaintiff could institute proceedings for the foreclosure of the mortgage it was necessary that the latter should have in its possession some of the bonds or should have received a request from bondholders for such action. The trust deed provided:

"The Trustee may, and upon written request of the holders of twenty (20) per cent of the bonds secured thereby, then outstanding, requesting enforcement of this mortgage, shall by notice in writing to 'The Company' (meaning appellant) and to 'The Corporate Guarantor,' (meaning the Transfer Company) * * declare the entire principal of all the bonds then outstanding to be forthwith due and payable, and * * 'The Trustee' in its own name, and as trustee of an express trust, or otherwise, may take such proceedings at law or in equity as may be advised by counsel, to enforce the payment of the bonds and interest accrued or to accrue, to compel the specific performance of the covenants and obligations herein contained, and to obtain all other appropriate relief. * * "

The instrument further provided, "All rights of action on or because of the bonds and interest coupons, or any of them, or under this agreement, except as hereinafter provided, are hereby expressly declared to be vested exclusively in 'the trustee,' and such rights may be enforced by 'the trustee' without the possession of any such bonds or interest coupons. * * "

As a matter of fact one of the two alternatives of appellant's contention actually occurred. The

Ralph Schneeloch Company June 15, 1926, owned several thousand dollars worth of bonds, and many interest coupons due and payable on that day; it earnestly insisted upon a prompt foreclosure. In fact its attitude in this respect forms in part the basis of many of the contentions of the appellant that the Schneeloch Company undertook to ruin the appellant and secure its property at a sacrifice price. But we do not believe that possession of bonds by the plaintiff or a request from the bondholders was necessary to the institution of this suit. *Armstrong County Trust Co.* v. *Freeport Water Works*, 291 Pa. St. 188 (139 Atl. 856).

■ One of the principal contentions of the appellant is that the trustee failed to employ assets in its possession so as to avert the default. As we have seen before the Storage Company was the tenant of the appellant under a lease which stipulated monthly installments of rent sufficient to enable the plaintiff to discharge the semi-annual interest coupons and made payment of the installments of principal which began to fall due June 15, 1926. It was not until June 14th, that the trustee was advised that money would not be forthcoming to meet the $7,000 principal and $12,250 interest due and payable the next day. At that time there was in the trustee's possession only $3,962.25, which was $15,287.75 less than the necessary amount. The plaintiff was possessed, however, of $25,000 of the second preferred stock of the Transfer Company. This had been placed in its possession by virtue of one of the terms of the trust deed which provided that the Transfer Company, as lessee, "shall deposit with the Trustee the sum of $15,000 in cash, as an advance payment of the rentals last to accrue under the terms of said

lease," and that simultaneously with the execution of the lease the Transfer Company, as lessee, "shall deposit with the Trustee, as security for the payment of said sum of $15,000 at the time and in the manner herein stated $25,000 in amount par value of the second preferred stock of the Security Storage & Transfer Company the said preferred stock so deposited shall be withdrawn and returned to the corporate guarantor (meaning the Transfer Company) on deposit of the $15,000 in cash as hereinabove provided." The lease, which was executed in compliance with the foregoing provisions of the trust deed, contained similar stipulations. It is to be observed that the $15,000 was intended "as an advance payment of the rentals last to accrue," and that the $25,000 second preferred stock was pledged to assure the deposit of the cash January 1, 1925. As a matter of fact the $15,000 was never paid, although it was frequently demanded. June 14th when the defendants advised the plaintiff that no funds were available to meet the bonds and interest coupons due and payable the following day they requested the plaintiff to dispose of the preferred stock and use the proceeds to meet the demands falling due the next day. This the plaintiff declined to do, and its refusal constitutes one of the principal premises for the appellant's contentions that the foreclosure was premature. We agree with the conclusions reached below that these contentions are without merit. There is no reliable testimony that the second preferred stock possessed a market value; having priority over it was the $50,000 first preferred stock possessed by the Marshall-Wells Company upon which no dividend had ever been paid. Several months prior to the alleged default the financial condition of the Transfer Company was

so far impaired that in order to pay the taxes and rent exacted in the lease previously mentioned it was compelled to borrow $25,000 at 10 per cent interest secured by a second mortgage upon the Security Building. Only a small portion of this debt had been discharged June 15th. The evidence warrants the conclusion that the Transfer Company and Mr. Younger had borrowed in its behalf whatever other sums they were able to secure, and that on the latter date these obligations were extensive. From these circumstances we may assume that the $25,000 second preferred stock possessed but little value; adding weight and significance to this inference is the fact that if Younger and his associates had believed that a buyer was obtainable they would have made the sale and would have substituted for the stock $15,000 in cash. Next it is evident that the stock was not usable for the purpose of paying the rents and interest charges due at that time; this conclusion follows from the provisions of the trust agreement previously quoted. In addition that instrument provides that rents received prior to June 15, 1926, should be used to retire bonds maturing June 15, 1934. Hence neither the $15,000 cash nor the stock, pledged to secure its payment, was usable to retire the $7,000 bonds payable in 1926.

■ It seems necessary to set forth our views in regard to only one more of the many contentions advanced by the appellant. It concerns the declaration of the default, and the means employed of accelerating the maturity of the entire debt. Each bond recited:

"For a description of the property mortgaged, the nature and extent of the security and rights of the holders of said bonds, and of 'The Company' (mean-

ing the appellant) and 'The Corporate Guarantor' 'The Individual Guarantor' and 'The Trustee' reference is hereby made to said mortgage.''

This we believe was sufficient to import the appropriate provisions of the trust agreement into the bonds: *Allan* v. *Moline Plow Co.,* 14 Fed. (2d) 912; *McClure* v. *Township of Oxford,* 94 U. S. 429 (24 L. Ed. 129); *Page* v. *Ford,* 65 Or. 450 (131 Pac. 1013, Ann. Cas. 1915A, 1048, 45 L. R. A. (N. S.) 247)

The trust agreement provided:

''Section 1.  If one or more of the following events (hereinafter called events of default) shall happen, that is to say:

'' (a) Default shall be made in the payment of any installment of interest on any bond hereby secured when and as the same shall become payable, and such default shall have continued for a period of ten (10) days, or

'' (b) Default shall be made in the payment of the principal of any such bond, or

'' (c) Default shall be made in the due observance or performance of any other covenant or condition herein required to be kept or performed by 'The Company,' or 'The Corporate Guarantor,' and such default shall continue for a period of thirty (30) days after written notice thereof to 'The Company' from 'The Trustee,' or from the holders of five (5) per cent in amount of the bonds secured hereby then outstanding, or

'' (d) Any order or decree shall be made for the appointment of a receiver of 'The Company' or 'The Corporate Guarantor,' and such order shall remain in force for a period of twenty (20) days, or

'' (e) A decree shall be entered adjudicating 'The Company' or 'The Corporate Guarantor' a bankrupt or dissolved, or

'' (f) Default shall be made in the due and timely deposit with 'The Trustee' of an amount or sum of

money sufficient to pay all the principal and interest of any bonds called for redemption,

"Then and in each and every case 'The Trustee' may, and upon the written request of the holders of twenty (20) per cent of the bonds secured hereby then outstanding requesting enforcement of this mortgage, shall by notice in writing to 'The Company' and to 'The Corporate Guarantor,' and/or 'The Individual Guarantor' declare the entire principal of all the bonds then outstanding to be forthwith due and payable * * *"

It is clear that the plaintiff served the proper default notice.

■ The appellant contends that Section B above should be read in connection with the remaining paragraphs and that therefore appellant was entitled to a number of days of grace after the default. We find in the quoted language no occasion for construction; it is clear and explicit; it provides for no days of grace when a default occurs in the payment of principal. The case of *Seattle Title Trust Co.* v. *Beggs,* 146 Wash. 435 (263 Pac. 598), is instructive and justifies the above conclusion.

■ Nor do we find in the above provisions of the trust agreement anything affected by a court of equity's attitude toward forfeitures and penalties. As was said in the case just referred to: "We do not think it is in any sense a forfeiture or penalty provision." In the text of 19 R. C. L. 493 we read: " 'The proposition is accepted without dispute that a stipulation in a mortgage providing that the whole debt secured thereby shall become due and payable upon failure of the mortgagor to pay the interest annually or to comply with any other condition of the mortgage is a legal, valid and enforceable stipu-

lation, and is not in the nature of a penalty or forfeiture.' "

■ When the above default occurred the financial condition of both companies was not promising. Whereas the appellant had experienced grave difficulties in making provisions for the semi-annual interest, installments of principal now began to mature which would have to be provided for. The $25,000 second mortgage bearing 10 per cent interest was still outstanding and had been only slightly reduced. Under the terms of the lease the installments of rent were now becoming materially increased. The Transfer Company had assumed the additional burden of another tenancy upon the large building at 3d and Glisan Streets, which we have previously mentioned. Rent upon the Security building was in default since November of 1925. Many efforts to sell the building or refinance the debts had been made, but all had failed. The companies had found it impossible to deposit the $15,000 final installment of rent, and to complete the alterations. Income was not yet equal to outgo. Before the plaintiff instituted this suit it urged the defendants to meet the demands of the trust agreement by making provisions for the sums due June 15th; it called a meeting of those secondarily interested in the property, and filed this suit only after it was convinced, in fact told, that no one would advance any money. These circumstances, as well as those previously reviewed convince us that this suit was not prematurely brought.

Unfortunately Mr. Younger and Mr. Grigsby found themselves engaged in a venture whose financial demands exceeded their resources. Both were aggressive and ambitious, and these characteristics caused them to constantly enlarge their operations; the latter

in turn expanded their liabilities until finally their limit was exceeded. The one had been an energetic member of the real estate profession, while the other was a capable and resourceful attorney; no unfair advantage was taken of them by anyone concerned in these transactions. We find that plaintiff's conduct in the handling of this piece of business was fair, just, and businesslike. The decree below is affirmed. Costs to the respondent. AFFIRMED.